```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4-5-10
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA,

          - against -                    09 Cr. 759 (DAB)
                                         MEMORANDUM & ORDER

MICHEL MOMPREMIER,

                            Defendant.
------------------------------------X
DEBORAH A. BATTS, United States District Judge.

     Defendant Michel Mompremier (the "Defendant") stands accused of one Count of Conspiracy to commit Health Care Fraud under 18 U.S.C. §§ 1347 and 1349 and one Count of Aggravated Identity Theft under 18 U.S.C. § 1028A(c). Defendant seeks an Order from the Court suppressing: (1) documents taken from him at the time of his February 26, 2008 arrest; (2) a document taken from his vehicle by the police at the time of his arrest; and (3) statements made by the Defendant to the police on the day of his arrest.

     For the following reasons, Defendant's Motion to Suppress the documents seized on February 28, 2008 is DENIED. Further, Defendant's Motion to Suppress statements made on the date of his arrest is GRANTED with regard to statements made in response to Detective Oliver's non-pedigree questions asked at the 45th precinct,[1] but DENIED in all other respects.

---

[1] The Government concedes that these statements were made in response to custodial interrogation, and has represented that it will not attempt to use these statements in its case-in-chief. (Gov's Mem. of Law, 14-15 & n.3.)

I.  BACKGROUND

Detective Joe L. Oliver ("Detective Oliver") has been employed as a detective with the Organized Crime Investigation Division of New York City Police Department ("NYPD") in the Bronx, New York for twenty years.  (Oliver Decl., ¶ 1.)  During 2008, Detective Oliver was investigating automobile accidents that had occurred in New York City on November 6, 2007, December 24, 2007, and February 6, 2008, which he believed had been intentionally caused in order to obtain and use police accident reports to support false insurance claims for medical treatment. (Oliver Decl., ¶ 3.)

During that investigation, Detective Oliver had determined that the November 6, 2007 accident in New York, New York involved a Ford, driven by an individual named Schnyder Louis, which had collided with the rear driver's side door of a Dodge driven by an individual who identified himself as "Victim 1."  (Oliver Decl., ¶ 4a.)  Detective Oliver also determined that the December 24, 2007 accident in Brooklyn, New York involved a collision between an Explorer and the rear driver's side door of another vehicle. (Oliver Decl., ¶ 4b.)  He confirmed that the Explorer was registered to Schnyder Louis, and that it was driven by an individual identifying himself as Victim 1.  (Oliver Decl., ¶ 4b.)  Additionally, Detective Oliver determined that the February 6, 2008 accident that occurred in New York, New York involved a

2

Nissan, driven by an adult male who identified himself as Victim-1, which had collided with the rear driver's side door of a Saab. (Oliver Decl., ¶ 4c.) After the February 6, 2008 accident, the individual identifying himself as Victim 1 had provided police officers with a Government Employees Insurance Company ("GEICO") automobile insurance policy. (Oliver Decl., ¶ 4c.)

On February 19, 2008, Detective Oliver interviewed Victim 1, a white male, who stated that he had been involved in the November 6, 2007 accident but not in the December 24, 2007 or February 6, 2008 accidents and that he had not received medical treatment for injuries resulting from any car accident. (Oliver Decl., ¶ 5.) Further, prior to February 26, 2008, Detective Oliver received documents from GEICO related to medical treatment claims made by an individual identifying himself as Victim 1, in connection with the February 6, 2008 accident. (Oliver Decl., ¶ 7.) The documents from GEICO included photo identification of the individual identifying himself as Victim 1 provided to a Brooklyn Clinic, showing the image of a black male. (Oliver Decl., ¶ 7.) Detective Oliver checked the New York City Department of Finance database and found that the Explorer involved in the December 24, 2007 accident and the Nissan involved in the February 6, 2008 accident had both received parking tickets in the vicinity of the same Brooklyn Clinic. (Oliver Decl., ¶ 8.)

From his investigation, Detective Oliver declares that by February 26, 2008 he suspected that the individual driving the Ford that struck Victim 1's Dodge on November 5, 2007 had stolen Victim's 1 identification information from the November 5, 2007 accident report and then falsely identified himself as Victim 1 after the December 24, 2007 and February 6, 2008 accidents. (Oliver Decl., ¶ 6.)

On February 26, 2008, Detective Oliver was conducting surveillance in the vicinity of the Brooklyn Clinic when he observed both the Nissan that had been involved in the February 6, 2008 accident and the Explorer that had been involved in the December 24, 2007 accident parked near each other. (Oliver Decl., ¶ 9.) In the driver's seat of the Explorer he saw an adult black male who was later identified as the Defendant, Michel Mompremier. (Oliver Decl., ¶ 10.) Detective Oliver asked the Defendants "Who are you?" and showed him his police shield. (Oliver Decl., ¶ 10.) The Defendant responded "Michael" and asked Detective Oliver what was wrong. (Oliver Decl., ¶ 10.) Detective Oliver then asked the Defendant if the Explorer belonged to him and whether he had a driver's license, to which the Defendant responded that he had purchased the vehicle a few weeks ago and did not have a driver's license. (Oliver Decl., ¶ 10.)

Detective Oliver identified the Defendant as the same black

4

adult male pictured in the photograph identification that GEICO had sent him in connection with the February 6, 2008 accident insurance claim. (Oliver Decl., ¶ 11.) At this time, two additional officers who Detective Oliver had alerted to the presence of the Nissan and Explorer arrived on the scene and Detective Oliver ordered the Defendant to get out of the Explorer, which he did. (Oliver Decl., ¶ 12; Mompremier Aff., ¶ 2.)

Detective Oliver declares that, at this point, the two other officers took the Defendant to the sidewalk while he reached through the driver's side window of the Explorer and removed an MRI referral in the name of Victim 1 from behind the driver's side sun visor. (Oliver Decl., ¶ 12.) Detective Oliver declares that after he removed the MRI referral from the Explorer he approached the Defendant and asked him who Victim 1 was, to which the Defendant explained that Victim 1 was his own real name. (Oliver Decl., ¶ 13.) Detective Oliver states that it was at this point that he arrested the Defendant, searched his pockets, found documents, and proceeded to drive the Defendant to the 45th precinct. (Oliver Decl., ¶ 13.)

The Defendant declares, however, that Detective Oliver did not search the car, but instead arrested the Defendant on the street while the remaining two NYPD officers searched the car. (Mompremier Aff., ¶ 2; Mompremier Supp. Decl., ¶¶ 1-2.) The

5

Defendant declares that one of the two officers then pulled a piece of paper from the car and yelled to Detective Oliver "Bingo," at which point Detective Oliver began searching the Defendant.  (Mompremier Aff., ¶ 3; Mompremier Supp. Decl., ¶ 2.) The Defendant states that Detective Oliver then removed various papers from his front pockets, handcuffed him, and placed him in the back seat of the police car to take him to the precinct. (Mompremier Aff., ¶ ; Mompremier Supp. Decl., ¶¶ 2-3.)

While driving the Defendant to the precinct, Detective Oliver asked what his real name was, to which he responded "Michael Mompremier."  (Oliver Decl., ¶ 14.)  At the 45th precinct, Detective Oliver asked the Defendant various pedigree questions, including his name and address, and the Defendant stated that his name was Michel Mompremier and gave an address in Brooklyn, New York.  (Oliver Decl., ¶ 15.)  Although Detective Oliver had not then asked the Defendant any further questions, when he walked up to the Defendant, the Defendant told Detective Oliver that it seemed like Detective Oliver did not want to speak with him and that Detective Oliver was not like the "feds." (Oliver Decl., ¶ 16.)  The Defendant also informed Detective Oliver that he wanted to "make a deal" and that he could identify the people "who were doing this."  (Oliver Decl., ¶ 16.) Detective Oliver told the Defendant that he could not make a deal without the involvement of his lawyer and the District Attorney's

6

Office, but asked the Defendant if he knew the real names of the people who were in the vehicle with the Defendant on February 6, 2008. (Oliver Decl., ¶ 17.) The Defendant responded "yes" but said that he would not provide those names at that time in response to Detective Oliver's follow-up question. (Oliver Decl., ¶ 17.)

About twenty minutes later, Detective Oliver asked the Defendant if he wished to make a phone call, and the Defendant gave Detective Oliver the phone number of his friend "Jean." (Oliver Decl., ¶ 18.) Detective Oliver declares that he asked the Defendant no further questions and received no further statements from him. (Oliver Decl., ¶ 19.) Detective Oliver also declares that he did not advise the Defendant of his Miranda rights nor is he aware that any other officer did so on February 26, 2008. (Oliver Decl., ¶ 19.)

## II. DISCUSSION

A.  Arrest and Search of the Defendant

"Probable cause requires an officer to have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested. When determining whether probable cause exists courts must consider those facts available to the officer at the time of the arrest and immediately before

7

it, as probable cause does not require absolute certainty. Courts should look to the 'totality of the circumstances' and must be aware that probable cause is a fluid concept - turning on the assessments of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules." Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006) (quoting Boyd v. City of New York, 336 F.3d 72, 76 (2d Cir. 2003); Caldarola v. Calabrese, 298 F.3d 156, 162 (2d Cir. 2002); Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000)).

Further, while warrantless searches and seizures are per se unreasonable under the Fourth Amendment unless they fall within a recognized exception to this rule, one of which is a search incident to a lawful arrest. Evans v. Solomon, — F.Supp.2d — , 2010 WL 276189, **9, 11 (E.D.N.Y. 2010). "Under th[is] exception, a lawful custodial arrest permits a police officer to search the arrestee's person and the area within his immediate control." Id., *11 (quoting Arizona v. Gant, 129 S.Ct. 1710, 1716 (2009)).

Here, by February 26, 2008, Detective Oliver knew that the photograph of a black adult male identified as Victim 1 had been submitted to GEICO as part of a medical insurance claim resulting from the February 6, 2008 automobile accident. He also knew that Victim 1 was, in reality, a white adult male who had only been involved in the November 5, 2007 accident, and had not received

8

treatment for any medical injuries resulting from the three accidents at issue. Further, Detective Oliver knew that the Explorer involved in the December 24, 2007 accident and the Nissan involved in the February 6, 2008 accident had both received parking tickets in the vicinity of the same Brooklyn Clinic where the black adult male identifying himself as Victim 1 had submitted insurance claims, and that these two vehicles were now parked near each other outside that same clinic.

Accordingly, when Detective Oliver observed both the Nissan and Explorer involved in those accidents parked together in the vicinity of the Brooklyn Clinic on February 26, 2008, and observed that the individual in the driver's seat of the Explorer was the same individual whose photograph was included in the false insurance claim made after the February 6, 2008 accident, he had a more than ample basis for probable cause to believe that the Defendant had and was committing the crimes of insurance fraud and identity theft.

Because the Court finds that the Defendant's arrest on February 26, 2008 was based upon probable cause, it also finds that the search of Defendant's person was lawful as a search incident to a lawful arrest. Accordingly, Defendant's Motion to Suppress evidence seized during the search of the Defendant is DENIED.

9

B.   Search of the Vehicle

In <u>Arizona v. Gant</u>, 129 S.Ct. 1710 (2009), the Supreme Court recently reaffirmed that "if there is probable cause to believe a vehicle contains evidence of criminal activity," then precedent "authorizes a search of any area of the vehicle in which the evidence might be found." <u>Id.</u>, 1721.  Here, the Court finds that Detective Oliver had probable cause to search the Explorer for any documents related to medical treatment of the Defendant while he was identifying himself as Victim 1, for documents showing the real identity of the Defendant, and for the Explorer's registration and insurance information, all of which would constitute evidence of the insurance fraud that Detective Oliver had been investigating.

The Defendant contends that an evidentiary hearing is necessary because there is a conflict between his testimony and that of Detective Oliver concerning which officers searched the Explorer.  The Court finds, however, that even assuming the truth of the Defendant's claim that the other two officers searched the Explorer, the Defendant would not be entitled to the suppression of the evidence recovered from that search.

"Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient

10

information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001) (citing United States v. Hensley, 469 U.S. 221, 230-33 (1985)). This "imputation of knowledge from one police officer to another requires that officers be working on the same case." United States v. Feliz, 657 F.Supp.2d 364, 372 (E.D.N.Y. 2009)(quoting United States v. Santa, 180 F.3d 20, 28 (2d Cir. 1999)).

Here, whether or not the two other officers on the scene knew all of the specific information about the case, it is clear from the uncontested testimony submitted to the Court that they were working on Defendant's case, that Detective Oliver had called them to "alert [them] to the presence of the Nissan and the Explorer," (Oliver Decl., ¶ 12), and that they were searching the Explorer for identification documents related to the insurance fraud, (Mompremier Supp. Decl., ¶ 2) ("One of these officers after seizing a paper from the car yelled to officer Oliver 'BINGO.' Then Detective Oliver began to search me.")

Accordingly, even if the two other officers searched the Explorer, rather than Detective Oliver, under the imputed knowledge doctrine, Detective Oliver's knowledge and basis for probable cause to search the Explorer is imputed to the two other officers. Defendant's Motion to Suppress evidence taken from the

11

Explorer is therefore DENIED.


C.   Post-Arrest Statements

The warning requirements of Miranda v. Arizona, 384 U.S. 436 (1966), apply in situations of "custodial interrogation." An individual is considered to be "in custody" when he is "subjected to restraints comparable to those associated with a formal arrest." The "ultimate question is how a reasonable man in the suspect's position would have understood the situation" and "two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." Georgison v. Donelli, 588 F.3d 145 (2d Cir. 2009) (internal quotations omitted).

"Interrogation" has been defined to include "express questioning, [and] any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Acosta v. Artuz, 575 F.3d 177, 189 (2d Cir. 2009)(quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). While the "latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police . . . the Court declined to hold the police

accountable for the unforeseeable results of their words or actions." Id. (quoting Innis, at 301-02.)

Here, Defendants statements fall into four categories. First, the Defendant made statements in response to questions from Detective Oliver prior to his arrest, while he was seated in the Explorer. These statements were not the result of "custodial" interrogation, given that the Supreme Court has found that even where a motor vehicle has been stopped by the authorities, subsequent questioning is not custodial under Miranda. See, e.g., United States v. Newton, 181 F.Supp.2d 157, 169 (E.D.N.Y. 2002)(quoting Berkemer v. McCarty, 468 U.S. 420, 436 (1984). A fortiori, where Detective Oliver did not stop the Defendant's vehicle but merely approached the parked Explorer and asked the Defendant questions, there is no basis to find that the Detective Oliver's questions where custodial.

Second, the Defendant responded to Detective Oliver's pedigree questions about his name, address, and whether he wanted to make a telephone call. Such pedigree questions are not interrogation under well-settled precedent. See Rosa v. McCray, 396 F.3d 210, 221 (2d Cir. 2005).

Third, the Defendant made unsolicited statements to Detective Oliver at the precinct, including that it seemed like Detective Oliver did not want to speak with him, that Detective Oliver was not like the "feds," and that he wanted to "make a

13

deal" to identify the people "who were doing this." Nowhere in his affidavit or supplemental declaration does the Defendant assert that Detective Oliver said anything or took any action to solicit these statements. Because these statements were made voluntarily, they are not the result of interrogation under Miranda.

Finally, at the precinct, the Defendant made statements in response to Detective Oliver's questions about whether he knew the real names of the people who were in the vehicle with the Defendant on February 6, 2008. The Government has conceded that these statements were made in response to custodial interrogation, and has represented that it will not use these statements in its case-in-chief. (Gov's Mem. of Law, 14-15 & n.3.)

Accordingly, Defendant's Motion to Suppress statements made to Detective Oliver on the date of February 26, 2008 is GRANTED with respect to the statements made in response to Detective Oliver's non-pedigree questions at the precinct, but DENIED in all other respects.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress documents seized on the date of his arrest is DENIED. Further, Defendant's Motion to Suppress statements made on the date of his

14

arrest is GRANTED with regard to statements made in response to Detective Oliver's non-pedigree questions asked at the 45th precinct, but DENIED in all other respects.  The next conference in this matter is scheduled for Thursday, May 13, 2010 at 4:30 PM.  In the interests of justice, time is excluded under the Speedy Trial Act until then.

SO ORDERED.

Dated:     New York, New York

    April **5**, 2010

*Deborah A. Batts*
DEBORAH A. BATTS
United States District Judge